At a Court of Oyer and Terminer held at this term, Jesse Draper, a deaf and dumb man, was indicted for the murder in the first degree of Nathaniel H. Dickerson. On his arraignment the Attorney General read the indictment aloud to him, and on the question being put to him, guilty or not guilty, his counsel, Mr. Cullen, responded for him, not guilty, and *Page 292 
thereupon the Court ordered the plea of not guilty to be entered upon the record. The evidence in the case was that the prisoner, who was a negro, about thirty years of age, and deaf and dumb from his birth, had been living for the last seven years in the family of the father of Nathaniel H. Dickerson, the deceased, working on the farm with the father and the deceased and another son, and had long evinced a strong and peculiar partiality for the whole family, and had never before manifested any disposition to injure any member of it, or fear of any of them, except the deceased, who was the only member of it capable of mastering him, and who had sometimes had occasion to conquer and chastise him, when in his violent and angry moods actual force was required to overpower and subdue him.
On the evening of the 9th of November preceding, the father and the deceased, his brother and the prisoner had been in Georgetown, and on their return together to the farm a few miles from town, and soon after leaving it, the deceased, who had been following on foot some distance behind the cart drawn by a yoke of oxen, in which the deceased, his father and brother were riding, came up and got in and sat down at the tail of it, when the deceased, who was seated on the side of it and driving the oxen, ordered him by signs which he well understood, to get out and walk, because the oxen were tired, and it increased too much the weight in the cart at that end of it, to which he paid no attention, but on the repetition of it he got out in a very angry mood and made a great deal of noise, muttering and mumbling as he walked nearly a half mile by the side of the cart, the violence of his anger and passion increasing as he proceeded, until finally he went round the cart and up to the side of it on which the deceased was sitting, and shook his fists violently at him, when the latter threw off his coat, sprang out of the cart, and both at the same time seizing hold of each other the deceased threw him on the ground, and was on top of him, when after some delay, the cart and oxen still proceeding *Page 293 
onward with them, the father and brother got out and went back to the spot to separate them, and where they found them lying side by side on the ground, the deceased badly cut with a knife on the left side of his neck and who died of the wounds in a few minutes afterwards. It was then between the hours of nine and ten o'clock at night, and on reaching home and examining his body it was found to be cut and stabbed in fifteen different places with a sharp pocket-knife by the prisoner, as it was afterwards ascertained, the immediate cause of his speedy death consisting of the cut first discovered in the left side of the neck, three inches in length and two in depth, and which completely severed both the jugular vein and artery. When first seen by the father, after the deceased jumped out of the cart, they were striking at each other, they then ran together, clung hold of each other, and the deceased threw him on the ground, falling on top of him; and when arrested, as he was that night, there was a lump on the forehead of the prisoner, just above the left eye, which had the appearance of having been made by a recent and severe blow with a fist.
It further appeared in evidence that the prisoner was a strong and athletic man, whom but few were able to overpower in a trial of strength or personal conflict, and although he and the deceased had several times fallen out, and the deceased had always before overpowered and whipped him in such conflicts, he had never seriously hurt him, and they were in general on very good and friendly terms with each other. And although the prisoner had never been able to speak or hear, and had never received any instruction or education in the alphabet or language of signs taught in the schools of mutes, he had signs of his own by which he could readily communicate his ideas to and converse with such persons as were familiarly acquanited with him, on many ordinary matters and things, and was possessed of a good deal of intelligence and mechanical ingenuity, and was not only a good hand and workman on a farm, but could make well any *Page 294 
article he tried to make that was required upon it, and knew the boundaries of it and of the adjoining tracts in the woods better than the owner of it, and knew the difference in the value of our national silver coins, as well as our smaller bank notes, and could be sent to the stores in town to buy many ordinary articles required on the farm or in the family; and although he had never received any religious instruction, he seemed to have some conception of a future state of rewards and punishment, and to believe that there is a heaven above for the good and a hell beneath for the bad, indicating by appropriate signs that those who shout at religious meetings will go to the former, while the bad would descend to the latter. He also in like manner could make known that he knew the public jail and the whipping post and pillory, and what they were for in Georgetown, and that people who stole were there whipped and imprisoned for it. His previous character had been good, and though evidently conscious of what he had done, he made no effort to escape or attempt to deny it, but seemed apparently to exult over it. To a witness who knew him very well, and soon after saw him passing on the road that night with a good deal of blood on his clothes, and who by signs enquired of him the cause of it, he replied by signs which he understood that he had had a fight with a man and had cut his throat and killed him, and that it was the man with whom he knew he had had a fight not a great while before, by which he knew he meant the deceased, whom he also knew very well; and that the prisoner was very angry when he first came up to him on the road, and seemed to grow more so while communicating this intelligence to him. It was further proved that the prisoner had purchased the knife with which the cutting and killing of the deceased was done, some time prior to that, at a store in Georgetown, and that he was seen sharpening it on a grindstone two days before, and that on that night before they left Georgetown the prisoner showed it to another witness, and how sharp it was, and then flourished it around in his *Page 295 
hand as if cutting with it, but what more if anything further he meant by it, he could not say.
The questions presented in the case, and which it would be their duty to consider and determine on the evidence before them were, whether the prisoner was criminally responsible for killing Nathaniel H. Dickerson, the deceased, on the night of the 9th of November last, in the manner and under the circumstances proved, and about which there was no dispute, inasmuch as it was also proved, and not disputed, that the prisoner was, and had been from his birth, a deaf and dumb person, without any instruction or training in any school for the education of mutes, and if so responsible, then to what extent was he here criminally responsible for it on this indictment, which is for murder with express malice aforethought, and of the first degree under the statute.
He then proceeded to define the crime of murder with express malice aforethought, and read from 1 Russ. on Crimes, the definition of it, as follows: Express malice is when a person kills another with a sedate, deliberate mind and formed design, such formed design being evidenced by external circumstances discovering the inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some *Page 298 
bodily harm. And this malice must be aforethought, and this sedate, deliberate mind and formed design to kill or to do some great bodily harm to the person slain, as thus evidenced and shown by external circumstances, must be formed and exist in the mind of the slayer before the mortal blow is given or the act or harm done to the body of the slain which causes the death, is committed. And when such is the case, and such is the evidence, it is murder of the first degree under the statute. But the crime of murder may also be committed at common law and under the statute without express malice aforethought, but with what is known and defined in law as implied malice aforethought, and which is implied by law from any deliberate, cruel act committed by one against another, however sudden, which causes his death, as where one person kills another suddenly without any, or without a considerable provocation, the law implies malice; for no person, unless of an abandoned heart, would be guilty of such an act upon a slight or no apparent cause. 1 Russ. on Crimes, 482, 483. And in such a case the killing will be murder of the second degree under the statute. It has, however, been contended by the counsel for the prisoner, conceding for the sake of argument that he can be held criminally responsible for the act, that the killing in this case can in no event be considered, under all the circumstances proved, as amounting to more than the crime of manslaughter, which is by the same authority defined to be whenever death ensues from a sudden transport of passion, or heat of blood upon a reasonable provocation, and without malice, it is considered as solely imputable to human infirmity, and the offense will be manslaughter; but no words however offensive they may be, nor even a blow with the fist, will be sufficient to free the party killing from the guilt of murder, if upon such provocation a deadly weapon be made use of, or an intention to kill, or to do the party some great bodily harm was otherwise manifested, nor will even a blow be considered a sufficient provocation to extenuate the crime and reduce it to manslaughter *Page 299 
where the revenge is disproportioned to the injury inflicted by it, and is outrageous and barbarous in its nature, if malice aforethought express or implied is proved to have existed in either of such cases. 1 Russ. on Crimes, 580, 581.
According to the testimony of James Dickerson, the brother of the deceased, the evidence on this point was substantially to the following effect: He and his father and brother, Nathaniel H. Dickerson, and the prisoner were together in this place, and started home to the farm of his father a few miles from here that evening with the cart and oxen, his father, brother and himself in the cart and the prisoner following on foot some distance behind it, but who overtook them not far from town, and got into the tail of the cart, when his brother, the deceased, who Was seated on the side of the cart and driving, told him by signs which he understood, to get out and walk, because his weight made the cart too heavy behind, and the oxen were tired and were getting along very slow before he got into it, and that the prisoner at first did not do it, but on his brother's telling him again soon afterwards to get out and walk, he got out very angry and walked along the side of the road and the cart about half a mile making a good deal of noise muttering and mumbling in his angry way to provoke his brother to attack him, and growing madder and madder (to use the language of the witness) as he proceeded, he passed to the other side of the road and that of the cart on which his brother was then seated and shook his fists violently at him, when his brother instantly threw off his coat, sprang out of the cart at him, and after striking a few blows at each other, they clung and his brother threw him on the ground falling on top of him. Not apprehending anything serious as likely to occur from it, they did not immediately stop the oxen and get out of the cart and go back to separate them, but after a while they did so, and when they reached the place where they fell they found them both lying on the ground side by side, and his brother cut in the neck *Page 300 
as described more particularly by the physician who made the examination of the body, and other numerous cuts and stabs received by him in the combat, and that when they separated them and the prisoner left the place he was very angry, and was making a great deal of noise and exulting apparently in what he had done. And if the jury were satisfied from the testimony of the brother and father of the deceased that such were the facts of the case which immediately preceded, accompanied and concluded the mutual combat between the parties, and that the prisoner sought and provoked the combat for the purpose and with the intention of using his knife and killing or severely wounding the deceased with it in the fight, then we must say to the jury that if they should be further satisfied from all the evidence which they had heard in the case that the prisoner at the time when he inflicted these knife-wounds on the body of the deceased, had capacity and reason sufficient to enable him to distinguish between right and wrong as to those acts, and had a knowledge and consciousness that the act he was doing was wrong and criminal, and would subject him to punishment, and to understand the nature and consequences of it, and to know that it was wrong and criminal, his offense would be, in contemplation of law, murder with express malice aforethought, and of the first degree under the statute. 2 Greenl. Ev. Sec. 372. But if the jury should not be satisfied from the evidence that the prisoner sought and provoked the fight with the deceased for the purpose and with the intention before mentioned, and only bethought himself of the pocket knife he was then daily carrying in his pocket, and determined to use it against the prisoner after the fight had begun and in a sudden and violent transport of anger and passion produced by the combat, and so used it without any such previous design or intention, the offense would amount to manslaughter only, provided the jury should also at the same time be further satisfied from all the evidence which they had heard in the case that the prisoner had *Page 301 
sufficient capacity and reason to distinguish between right and wrong as to the act itself, and knowledge to understand that it was wrong and criminal and would subject him to punishment as before stated. For there could be no doubt on the proof upon that point that having been already greatly exasperated and incensed by the order of the deceased to get out of the cart and walk while he and his father and brother remained in it, he must have been still more infuriated with anger and passion when the deceased, unfortunately for himself, with more rashness than prudence or legal justification, sprang out of the cart and commenced the fight with him, on his merely shaking his fists violently at him in it, particularly, when we consider the peculiar and natural infirmity with which the prisoner was unfortunately afflicted. They must have both been very angry at that moment, and the mutual blows which followed could have but increased the rage of such a person as the prisoner unfortunately appears to have been; and therefore, unless the jury should be satisfied from all the evidence before them in the case that the prisoner possessed sufficient capacity and reason to be criminally responsible as before stated, and was actuated by antecedent malice and malignity against the deceased, and with a preconceived design provoked him to attack him on the occasion for the purpose of gratifying that malice and malignity by cutting and stabbing him with the pocket knife with which he was then provided and prepared for that purpose, no malice could be implied by law from the facts and circumstances proved in the case, and the transport of passion and heat of blood in which it was suddenly done in the fight between them, would extenuate and reduce the commission of the act to the crime of manslaughter.
In all cases of alleged crime, the crime alleged having been proved to have been committed by the accused, it is the general rule that he is presumed to have been at the time sane or of sound mind, and to have had a sufficient degree of reason to be criminally responsible *Page 302 
for it, until the contrary has been proved to the satisfaction of the jury. But this rule of law does not apply to a deaf and dumb person when charged with the commission of a crime. On the contrary, the legal presumption is then directly reversed; for in such a case it is incumbent upon the prosecution to prove to the satisfaction of the jury that the accused had capacity and reason sufficient to enable him to distinguish between right and wrong as to the act at the time when it was committed by him, and had a knowledge and consciousness that the act he was doing was wrong and criminal, and would subject him to punishment; and this the State was bound to prove in this case in regard to the capacity and reason, knowledge and understanding of the prisoner at the bar to the satisfaction of the jury, or it would be their duty to acquit him. And owing to this legal presumption in his favor, the prisoner would be entitled to the benefit of any reasonable doubt which the jury might have on that subject. He would also be entitled to the benefit of any reasonable doubt which they might have as to the act having been committed by him with express malice aforethought, as before explained and defined, if they should be clearly of the opinion after carefully and maturely considering all the evidence in the case that he was criminally responsible, and in that event he could not be properly convicted of any crime greater than manslaughter.
The verdict of the jury was, not guilty by reason of insanity, or want of criminal responsibility.